UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STAR INSURANCE COMPANY,

        Plaintiff,                               Case No. 07-11069
                                                    Honorable Julian Abele Cook, Jr.

v.

A.M. SKIER AGENCY, INC.,

        Defendant.

ORDER

      This dispute arises from an underlying workers' compensation claim by Gregg Bettis who, while serving as the president of KAAF, was injured on June 10, 2004 when a company-owned single engine airplane that he was piloting crashed. At the time of the accident, Bettis was in the process of flying his aircraft from Branson, Missouri (the location of the KAAF's corporate offices) to a KAAF camp in Golden, Missouri where he and his wife reside during the summer months. According to Bettis, it was his regular procedure to work at his office in Branson, Missouri and, thereafter, return to his summer home in Golden with the aid of the KAAF aircraft where he would entertain donors and supervise camp activities during the evening hours.

      In October 2004, he filed a claim for workers' compensation benefits with the Plaintiff, Star Insurance Co. ("Star"), claiming that the accident had occurred within the scope and course of his employment. As the insurer of KAAF, Star conducted an investigation, agreed with Bettis' version of the incident, and, thereafter, approved his claim. As a result, Star (1) paid Bettis' medical and rehabilitative bills and expenses in the amount of $225,989.05, (2) established a medical reserve fund of $248,600.88 to pay for his future medical and rehabilitative expenses, and (3) established

1

an indemnity reserve of $98,183.60 for the payment of Bettis' permanent disability claim, all of which amounted to the total sum of $572,773.53.

I.

On June 1, 2003, the parties to this lawsuit entered into a contract wherein the Defendant, A.M. Skier, a Pennsylvania insurance agency corporation, agreed to underwrite workers' compensation insurance policies for the children's camps that were insured by Star. Their agreement (1) required A.M. Skier to comply with Star's underwriting guidelines, and (2) authorized the agency to obtain workers' compensation insurance business through sub-agents, with the understanding that it would "assume full responsibility for the acts or omissions of any sub-agent . . . ." On the basis of this authority, A.M. Skier, through a sub-agent, Hibbs Hallmark and Company Insurance Agency ("Hibbs"), garnered the "Kids Across America Foundation" ("KAAF") account. Hibbs prepared an ACORD[1] workers' compensation application for insurance coverage and submitted it to A.M. Skier for underwriting purposes.. According to Star, A.M. Skier had the sole responsibility of reviewing the applications of any children's camps that had expressed a desire to participate in Star's workers' compensation insurance program. A.M. Skier, while acknowledging its responsibility for reviewing applications, insists that this review was always subject to approval by Star. According to Star, only those camp operations that met its eligibility criteria were to be underwritten by A.M. Skier.[2]

---

[1]The parties agree that ACORD is widely known throughout the industry as a company which provides standardized insurance applications, instructions, and forms.

[2]The only camp workers' "compensation classification codes" that were eligible for the program during the tenure of the parties' contract were "9015 (camp operations), 8742 (salesperson), and 8810 (clerical)." The ACORD workers' compensation application, as prepared by A.M. Skier's sub-agent Hibbs, identified 14 full-time workers as salespersons, 22

Under the terms of these parties' written contract, A.M. Skier, if after finding an applicant to be an acceptable risk in accordance with their underwriting guidelines, was obliged to submit this application to Star through an automated underwriting system, which is commonly known as the "Advantage System."[3] Star maintains that A.M. Skier reviewed and approved the KAAF application even though it was incomplete. It is Star's position that this application for insurance was neither signed by the applicant nor were there any explanations given for the "yes" answers on the application, as required by the parties' contract.

According to Star, the KAAF account was initially rejected by the Advantage System "as the premium and experience modification factor (claims experience) fell outside of the acceptable parameters." Nonetheless, Star acknowledges that it approved "these two deviations from A.M. Skier's underwriting authority" and that, in doing so, "the KAAF workers' compensation insurance was bound."

A.M. Skier disputes this characterization, arguing that the application "was kicked out and reviewed by a STAR underwriter . . . ," noting that "[t]he conclusions about what the underwriter actually reviewed that are made by [Star] are speculative . . . ." When these differences could not be resolved, this lawsuit followed with the filing of a complaint on March 13, 2007, in which Star asserted two theories ( namely, breach of contract and negligence) against the Defendant, A.M.

---

workers as clerical employees, and 200 workers as camp operations employees. Airplane pilots had a separate classification code (7421) which expressly "applies to the payroll of executive officers or other employees who operate fixed-wing aircraft in the conduct of the employer's business." No employee was identified as being involved in the operation of an aircraft.

[3]The Advantage System is an internet-based system through which A.M. Skier was granted authority to bind Star to acceptable workers' compensation insurance risk.

3

Skier Agency, Inc. ("A.M. Skier").

## II.

On November 20, 2008, Star filed a motion for summary judgment to which A.M Skier responded on December 11th. In its motion, Star argues that A.M. Skier breached the parties' contract when it, as an insurance agency, failed to obtain coverage for an aircraft that subsequently crashed and caused injuries to its occupant. According to Star, this failing caused it to unwittingly operate an uninsured aircraft which resulted in unwarranted costs in the amount of $572,773.53 that were created when its insured employee was injured after crashing his aircraft.

In response, A.M. Skier rejects Star's contention, arguing that the parties' contract did not include coverage for a private airline aircraft and its pilot. Moreover, A.M. Skier submits that "[n]either the insured, the insured's agent, nor [A.M.] Skier intended to provide workers compensation insurance for a private pilot." A.M. Skier also adds that Star, "due to the acts of inexperienced and/or careless adjusters" paid a claim that was not covered by the insurance policy.

## III.

Pursuant to Fed. R. Civ. P. 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party must demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This can be done by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

If the moving party satisfies its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elect. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When deciding a motion for summary judgment, the Court must view the evidence and draw "all justifiable inferences" in favor of the non-moving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the evidence the nonmoving party presents is "merely colorable" or "not significantly probative" summary judgment may be entered against it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). When determining the materiality of an issue, the substantive law, without regard to evidentiary requirements, governs "which facts are critical and which are irrelevant." *Id.* at 248.

IV.

In Michigan,[4] a party, who seeks to obtain damages under a breach of contract theory, must satisfy the following factors: (1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury. *Burton v. William Beaumont Hosp.,* 373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) (citing *Webster v. Edward D. Jones & Co., LP,* 197 F.3d 815, 819 (6th Cir. 1999)).

Regarding the first element, the requirements for a valid contract in Michigan are (1) parties competent to contract, (2) proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Id.* There is no dispute between the parties as to the existence of a valid contract between them. Thus, the first element has been satisfied.

---

[4]Both parties agree that Michigan law governs this case, as provided for by the agreement between them.

The second element, which requires the compliance of certain contractual obligations by A.M. Skier, appear to have been met.  According to the parties' written agreement, A.M. Skier was required to (1) comply with the terms of the contract and underwriting guidelines, (2) supervise its sub-agents; (3) advise its sub-agents of the limits of its authority under the Agreement and underwriting guidelines; (4) accept responsibility for any acts or omissions of its sub-agents; (5) be responsible for obtaining a fully completed and signed ACORD application for every risk that it sought to underwrite in the camp program; (6) assume the responsibility for obtaining an explanation for the "yes" response to the following question ( "Does applicant own, operate or lease aircraft/watercraft?"); and (7) to underwrite only worker's compensation risks with the authorized classification codes for camps.

A.M. Skier, while not disputing that the parties' written contract contained these obligations, argues that Star "cannot meet its burden to demonstrate a breach of the . . . contract because the insurance contract for 'Kids Across America' complied with Agency requirements." It also asserts that the claim should not have been paid because Bettis "was not actively engaged in work at the time he was hurt."  However, neither of these assertions are relevant to the question of whether the terms of the contract was violated.  Therefore, as A.M. Skier has not presented any evidence which challenges Star's contention that "the terms of the contract require performance of certain actions," the second element is also met.

Turning to the third element (i.e., whether a party breached the contract), A.M. Skier received an ACORD workers' compensation application from its sub-agent, Hibbs, which sought to obtain insurance coverage for KAAF.  On page two of the application, question one asks, "Does Applicant own, operate, or lease aircraft/watercraft?"  The box indicating "Yes" is checked with

6

an "x." However, in the remarks section below, there is no explanation for the response. Star correctly argues that this "breach is in direct conflict with Section IV.C.1. of the Workers' Compensation Underwriting Guidelines which expressly requires complete explanations for all 'Yes' responses."

Although A.M. Skier does not dispute that it accepted the application without requiring that the "Yes" response be fully explained, as required by the underwriting guidelines, it does submit - without pointing to any specific provision or other evidence - that the "Agency contract clearly required [A.M.] SKIER to write only those classifications that were approved by STAR . . . [and] [t]he decision to pay claims is retained by STAR." This argument fails to address the underlying issue of whether it did or did not violate the substantive terms of the parties's agreement. It is clear that Star's argument that "the failure to determine aircraft exposure was a violation of the [Agreement] and the Underwriting Guidelines" is correct. Finally, A.M. Skier does not dispute Star's claim that it failed to get the signatures of the agent and the insured on the application.[5] Thus, Star has met its burden regarding this third element.

In Michigan, the fourth element in a breach of contract claim is that the alleged violation caused an injury to the other party. Star argues that if A.M. Skier had properly identified the aircraft exposure, it would have never issued the workers' compensation policy. Star further submits that but for the improper issuance of the policy to KAAF, it would not have been responsible for the claim which arose from the injury to Bettis and the damage to the KAAF-owned aircraft.

---

[5]A.M. Skier, while arguing that the application signature is irrelevant to the claim, does not dispute that it did not secure both signatures, as required by the parties' contract.

Notwithstanding, A.M. Skier maintains that the policy was never intended to cover a private pilot and, even if it did, Bettis was not in the scope of his employment at the time of the crash. It also argues that it was Star's underwriter who ultimately approved the application. Star, in countering this argument, provided the Court - without any rebuttal by A.M. Skier - with evidence which indicates that the application "was not seen by a Star underwriter."

Fed. R. Civ. P. 56(e)(2) states the following:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

A.M. Skier has not demonstrated by affidavit or otherwise that Star received and reviewed the subject application for insurance. Moreover, there has not been any successful rebuttal to Star's claim that its Advantage system "provided some controls for the underwriting process that related to loss experience and premium . . . [t]he acceptability of risks and the exposures were purely the province of A.M. Skier."

Finally, A.M. Skier asserts that Bettis "was not in the scope of his employment at the time the accident happened." This argument has been challenged by Star in which it proffered presented specific evidence in the form of a sworn affidavit from Bettis who averred that he was working at the time of the crash. No evidence has been presented by A.M. Skier which even suggests that Bettis was not traveling between two of his employer's business locations in a company-owned aircraft. A.M. Skier's allegation that Bettis was not within the scope of his employment at the time of the crash, with nothing more, makes summary judgment in Star's favor appropriate as to this

element. As a matter of law, the Court concludes that the fourth element has been satisfied by Star.

In its motion for summary judgment, Star - supported by an affidavit from Meadowbrook, Inc., the company that handles claims for Star - seeks a declaration of indebtedness by A.M. Skier for the sum of $572,773.53, asserting that it has (1) paid Bettis' medical and rehabilitative bills and expenses in the amount of $225,989.05, (2) established a future medical reserve of $248,600.88 to pay for his future medical and rehabilitative expenses, and (3) established an indemnity reserve of $98,183.60 for the payment of a permanent disability claim for Bettis. A.M. Skier has failed to provide the Court with any evidence that rebuts or even addresses Star's accounting of damages.

IV.

Accordingly, the Court concludes that there is no genuine issue of a material fact in this matter as to Star's claim that (1) A.M. Skier violated the terms of its contract with Star and (2) the breach resulted in damages in the amount of $572,773.53. Hence, the Court grants Star's motion for summary judgment and, in addition, enters a judgment against A.M. Skier in the amount of $572,773.53. Finally, the Court denies A.M. Skier's motion for summary judgment of March 18, 2009 for reasons of mootness (Docket #32).

IT IS SO ORDERED.

Dated: August 11, 2009                          S/Julian Abele Cook, Jr.
       Detroit, Michigan                        JULIAN ABELE COOK, JR.
                                                United States District Court Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 11, 2009.

s/ Kay Doaks
Case Manager